## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**GREGORY SCOTT TURNER**                                    **CIVIL ACTION**

**VERSUS**                                                               **No. 17-3225**

**BP EXPLORATION & PRODUCTION**                          **SECTION I**
**INC., ET AL.**

### ORDER & REASONS

Before the Court is a motion[1] *in limine* to exclude the opinions of plaintiff's medical causation expert, Dr. Jerald Cook ("Cook"), filed by defendants, BP Exploration & Production, Inc.; BP America Production Company; BP p.l.c.; Halliburton Energy Services, Inc.; Transocean Deepwater, Inc; Transocean Holdings, LLC; Transocean Offshore Deepwater Drilling, Inc.; Transocean, Ltd.; and Triton Asset Leasing GmbH (collectively, "defendants"). BP has also filed a motion[2] for summary judgment, contending that if the Court grants BP's motion *in limine*, then summary judgment will also be warranted because plaintiff, Gregory Scott Turner ("Turner"), will lack necessary expert testimony. Turner opposes[3] both motions. For the following reasons, the Court grants the motion *in limine* and the motion for summary judgment.

---

[1] R. Doc. No. 43.

[2] R. Doc. No. 44.

[3] R. Doc. No. 45 (opposition to motion for summary judgment); R. Doc. No. 46 (opposition to motion *in limine*).

# I.   BACKGROUND

The instant action is a "B3" case arising out of the 2010 Deepwater Horizon oil spill in the Gulf of Mexico.[4] B3 cases involve "claims for personal injury and wrongful death due to exposure to oil and/or other chemicals used during the oil spill response (e.g., dispersant)." *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2021 WL 6053613, at *10 (E.D. La. Apr. 1, 2021) (Barbier, J.). In the course of the MDL proceedings, Judge Barbier approved the Deepwater Horizon Medical Benefits Class Action Settlement Agreement, which included a Back-End Litigation Option ("BELO") permitting certain class members to sue the defendants for later-manifested physical conditions. *Id*. at *2. The B3 plaintiffs, by contrast, either opted out of the class action settlement agreement or were excluded from its class definition. *Id*. at *10 n.3. To prevail on their claims, the "B3 plaintiffs must prove that the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response."[5]

Turner alleges that from June through November 2010 he was exposed to both oil and dispersants[6] as a resident of Mississippi and as a clean-up worker in multiple locations along the coast of Alabama and Mississippi following the Deepwater Horizon oil spill.[7] According to Turner, as a result of this exposure, he suffers from, among other things, respiratory problems, vision problems, myalgia, fatigue,

---

[4] R. Doc. No. 6 ("Severing 780 Cases in the B3 Pleading Bundle and Re-allotting Them Among the District Judges of the Eastern District of Louisiana") (Barbier, J.).

[5] *Id*. at 54 (noting that "proving causation will be a key hurdle for the B3 plaintiffs.").

[6] R. Doc. No. 44-2, at 5

[7] *Id*. at 4–5.

dizziness, and headaches.[8] Turner filed the instant civil action, seeking a jury trial with respect to his claims, which include negligence under general maritime law; gross negligence under general maritime law; negligence per se under general maritime law, state and federal law; claims under Louisiana nuisance law; negligence, gross negligence and/or failure to warn under state law; breach of contract; and battery.[9]

To support his claim that exposure to oil and dispersants caused his health problems, Turner provides a medical causation analysis completed by Cook.[10] Cook is a retired Navy physician, a fellow of the American College of Occupational and Environmental Medicine, and is board certified in occupational medicine, public health, and general preventative medicine.[11]

Cook's report utilized a "general causation approach to determine if a reported health complaint can be from the result of exposures sustained in performing cleanup work" and to assess "the likelihood that occupational exposures that occurred during work in oil spill cleanup caused disease, contributed to the development of disease, affected the severity of disease, or exacerbated pre-existing disease that workers have associated with potential exposures."[12]

---

[8] *Id.* at 7; R. Doc. No. 1-2, at 3, 7.
[9] R. Doc. No. 1, at 19–33.
[10] R. Doc. No. 43-4.
[11] *Id.* at 5.
[12] *Id.* at 14.

Cook's report is organized into five chapters. The first chapter outlines Cook's qualifications, which are not challenged.[13] The second chapter provides background on the *Deepwater Horizon* oil spill.

The third chapter describes Cook's methodology. The first step, as described in Cook's report, is to "review and analyze the available scientific literature to determine the strength of an association between environmental exposure and a health effect."[14] Cook states that, as part of this literature review, he selected the studies included in his general causation analysis "based on the quality of the study and study design."[15] Finally, Cook applies the Bradford Hill factors, which environmental toxicologists employ for causation analysis, to the selected studies to "to determine if a cause-and-effect relationship exists or not."[16] The Bradford Hill factors include: (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge. *Grant v. BP Expl. & Prod., Inc.*, No. 17-4334, 2022 WL 2467682, at *4 (E.D. La. July 6, 2022) (Vance, J.) (citing Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 600 (3d ed. 2011)). Cook explains that "[d]rawing causal inferences after finding an association and considering these

---

[13] R. Doc. No. 43-1, at 2.
[14] R. Doc. No. 43-4, at 17.
[15] *Id.* at 19.
[16] *Id.* at 24. "Sir Bradford Hill was a world-renowned epidemiologist who articulated a nine-factor set of guidelines in his seminal methodological article on causality inferences." *Jones v. Novartis Pharm. Corp.*, 234 F. Supp. 3d 1244, 1267 (N.D. Ala. 2017) (internal citations and quotations omitted).

factors requires judgment and analysis to determine if a cause-and-effect relationship exists or not."[17]

The fourth chapter of Cook's report recounts the history of oil spills and related clean-up efforts and analyzes prior studies on the health effects associated with exposure to oil.[18] These studies include the National Institute for Occupational Safety and Health's ("NIOSH") 2011 final health hazard evaluation ("HHE") report on the Deepwater Horizon oil spill, the Deepwater Horizon oil spill Coast Guard cohort study, and the Gulf Long-Term Follow-Up study ("GuLF Study"). Cook, through a close analysis of the above studies, concludes that there is a relationship between oil exposure among clean-up workers and a number of dermal, ocular, neurological, and respiratory conditions.[19]

---

[17] R. Doc. No. 43-4, at 24.

[18] *Id.* at 32.

[19] "During the response and cleanup activities, workers complained of various acute medical symptoms, including nasal congestion, cough, shortness of breath, headaches, nausea, dizziness, dermal irritation or rash, itchy and sore eyes, as well as heat-related conditions." *Id.* at 36 (discussing the results of the NIOSH HHE report); "Neurological symptoms were also noted to have a significant relationship in oil-exposed responders, including headaches, lightheadedness, difficulty concentrating, numbness/tingling sensation, blurred vision, and memory loss or confusion (Krishnamurthy et al., 2019). The cohort was also determined to have demonstrated a significant association between oil-exposed responders and hypertension, as well as chest pain, mitral valve disorders, sudden heartbeat changes, and palpitations . . . ." *Id.* at 44 (describing the "longitudinal data that shows a significant relationship between oil-exposed responders and respiratory symptoms" from the ongoing Coast Guard cohort study); Symptoms, such as coughing, wheezing, burning in nose, throat, lungs, and eyes "had a positive association with both direct work with dispersants and indirect work with dispersants . . . ." *Id.* at 59 (discussing the results of the GuLF Study).

Finally, the fifth chapter contains Cook's opinions on general causation for four categories of medical conditions: (1) respiratory conditions; (2) dermal conditions; (3) ocular conditions; and (4) cancers. Ultimately, Cook concludes that a "[g]eneral causation analysis indicates that these acute and chronic [respiratory, dermal, ocular] conditions can occur in individuals exposed to crude oil, including weathered crude oil, during oil spill response and cleanup work."[20]

## II.     STANDARDS OF LAW

### A.     Motion *in Limine*

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the

---

[20] *Id*. at 87, 92, 99. With respect to cancers, Cook notes that "[m]ost of the studies that have been done . . . show increased prevalence in acute symptoms . . . ." However, he also notes that, because of the differing latency periods for various cancers, "[a]t this time there are no epidemiology studies that show exposures to crude oil, weathered crude oil, or dispersants cause cancer." *Id*. at 99–102.

trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)).

*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires a trial court to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire*, 526 U.S. at 147.

A number of nonexclusive factors may be considered with respect to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the technique's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'" (quoting *Kumho Tire*, 526 U.S. at 152)). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent

7

with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

As for determining relevancy, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [under Rules 401 and 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702, Advisory Committee Note).

"[W]hen expert testimony is challenged under Rule 702 and *Daubert*, the burden of proof rests with the party seeking to present the testimony." *Kennedy v. Magnolia Marine Transp. Co.*, 189 F. Supp. 3d 610, 615 (E.D. La. 2016) (Africk, J.). The Court applies a preponderance of the evidence standard when performing its gatekeeping function under *Daubert. See Daubert*, 509 U.S. at 592 n.10. And the Court is not bound by the rules of evidence—except those rules concerning privileges—when doing so. *See id.*

## B.    Summary Judgment

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that

there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

If the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must then articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). These facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. If the nonmovant fails to meet their burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

## III.   LAW & ANALYSIS

### A.   Motion *in Limine*

B3 plaintiffs have the burden of proving that "the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response." *In re*

*Oil Spill by Oil Rig "Deepwater Horizon"*, 2021 WL 6053613, at *11; *accord Perkins v. BP Expl. & Prod., Inc.*, No. 17-4476, 2022 WL 972276, at *2 (E.D. La. Mar. 31, 2022) (Milazzo, J.).

When determining the admissibility of causation evidence in toxic tort cases, "[c]ourts use 'a two-step process . . . . First, the district court must determine whether there is *general causation*. Second, if it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible *specific-causation* evidence.'" *Seaman v. Seacor Marine, LLC*, 326 F. App'x 721, 722 (5th Cir. 2009) (quoting *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (emphases added in *Seaman*)). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* (quoting *Knight*, 482 F.3d at 351).

With respect to general causation, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Seaman*, 326 F. App'x at 723 (quoting *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)). "A plaintiff in such a case cannot expect lay fact-finders to understand medical causation; expert testimony is thus required to establish causation." *Id.*

Defendants assert that Cook's general causation opinion should be excluded

because it is unreliable. Specifically, defendants argue, among other things,[21] that Cook's report failed to identify a harmful dose of exposure to any particular chemical.

The Cook report in the present case suffers from the one of the same flaws which the Court identified in an earlier version of Cook's report excluded in *Murphy v. BP Expl. & Prod. Inc.*, No. 13-1031, 2022 WL 1460093 (E.D. La. May 9, 2022), and *Novelozo v. BP Expl. & Prod. Inc.*, No. 13-1033, 2022 WL 1460103 (E.D. La. May 9, 2022), insofar as Cook fails to identify a particular chemical and corresponding dose to which Turner was exposed.[22]

As this Court noted in *Novelozo*, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden [as to general causation] in a toxic tort case." 2022 WL 1460103, at *5 (quoting *Seaman v. Seacor Marine, LLC*, 326 F. App'x 721, 722 (5th Cir. 2009)). Several sections of this Court have subsequently concluded that Cook's testimony must be excluded due to this failure to include harmful level of exposure in his report. *See, e.g.*, *Harrison v. BP*

---

[21] R. Doc. No. 43-1, at 6–11. The defendants also contend that Cook's report is unreliable and, therefore, inadmissible because Cook failed to verify Turner's diagnoses and to follow accepted methodology for evaluating epidemiological studies. *Id.* at 11–19. Because this Court finds that Cook's report should be excluded for its failure to identify a particular chemical and dose of exposure, it need not address these alternative grounds for exclusion.

[22] Cook's deposition testimony lends further support to the defendants' argument that Cook is unable to provide an exposure level for a particular chemical that would cause Turner's ailments. When asked "If the legal test for general causation is that a review of scientific and medical literature demonstrates that exposure to a harmful level of a substance can cause a particular disease, have you given us that opinion," Cook responded, "I did not quantify that, no." R. Doc. No. 43-5, at 146:16–22.

*Expl. & Prod.*, No. 17-4346, 2022 WL 2390733, at *6 (E.D. La. July 1, 2022) (Morgan, J.); *McIntosh v. BP Expl. & Prod.,* No. 13-1020, 2022 WL 2342480, at *4 (E.D. La. June 29, 2022) (Barbier, J.); *Coleman v. BP Expl. & Prod.*, No. 17-4158, 2022 WL 2314400, at *7 (E.D. La. June 28, 2022) (Vance, J.); *Street v. BP Expl. & Prod. Inc.*, No. 17-3619, 2022 WL 1811144, at *6 (E.D. La. June 2, 2022) (Ashe, J.).

Turner addresses this lack of dose-response data in Cook's report by asserting that the defendants' failure to conduct dermal and biomonitoring of clean-up workers—which, Turner submits "would have created a quantitative exposure and dose database for these workers"[23]—is evidence that "BP consciously, or in the most favorable light negligently, avoided recording data which would show the exposure doses of spill workers."[24] Yet, as noted by other courts, the *Deepwater Horizon* oil spill Unified Area Command, which was composed of several federal and state agencies, "engaged in extensive and coordinated data collection and environmental monitoring efforts, in what has been characterized as 'the largest environmental investigation of an oil spill ever undertaken.'" *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *4 (N.D. Fla. Nov. 4, 2020), *aff'd sub nom. In re Deepwater Horizon BELO Cases*, 2022 WL 104243 (11th Cir. Jan. 11, 2022); *accord Grant v. BP Expl. & Prod., Inc.*, No. 17-4334, 2022 WL 2467682, at *10 n.58 (E.D. La. July 6, 2022) (Vance, J.). The availability of this data "cast[s] doubt on the assertion that there is a lack of monitoring data associated with the spill." *Grant*, 2022 WL 2467682, at *10 n.58; *see*

---

[23] R. Doc. No. 46, at 6.
[24] *Id.* at 11.

*also Harrison*, 2022 WL 2390733, at *7.

### B.      Motion for Summary Judgment

Having determined that Cook's report should be excluded, the Court now turns to defendants' motion for summary judgment. The issue of general causation is a necessary element of plaintiff's claims against defendants. Cook is Turner's sole expert on general causation.[25] With Cook's opinion on general causation now excluded, Turner lacks expert testimony with respect to general causation. As a result, Turner has failed to present a genuine issue of material fact with respect to his claims that his injuries were caused by exposure to oil and dispersants. Accordingly, defendants are entitled to summary judgment. *See, e.g.*, *Harrison*, 2022 WL 2390733, at *7; *McIntosh,* 2022 WL 2342480, at *6; *Coleman*, 2022 WL 2314400, at *12; *Street*, 2022 WL 1811144, at *7; *Novelozo*, 2022 WL 1460103, at *10.

---

[25] Turner's opposition to the defendants' motion *in limine* also notes that Dr. Rachel Jones "prepare[d] a general exposure assessment based on the available exposure data and upon the published exposure assessment literature, most of which deals specifically with exposure assessment of BP Oil Spill response workers." *Id.* at 4. However, Dr. Jones' report does not offer an opinion on general causation. Additionally, Dr. Jones is not a medical doctor and therefore is not qualified to opine on Turner's medical diagnoses. Accordingly, Dr. Jones' report does not cure plaintiff's deficiency as to general causation evidence. *See, e.g.*, *Coleman*, 2022 WL 2314400, at *12.

## IV.   CONCLUSION

For the reasons stated herein,

**IT IS ORDERED** that the motion *in limine* to exclude the causation testimony of Dr. Jerald Cook is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion for summary judgment is **GRANTED**. Turner's claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, July 27, 2022.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**